Yeah, I'd like to reserve five minutes, if I might. If you could move the mic just a little closer. Sure. Thank you. I'd like to reserve five minutes, if I might. At peace of the court, my name is John Henry Brown. I represent Victor Kohring, who was convicted in the Alaska bribery scandals that you've all heard about and we've all read about recently. And I think at some point, maybe toward the end of this presentation today, we can talk about the matters that were addressed yesterday and some briefs that were filed. There's a number of differences. My concern is that Victor Kohring will be thrown in with, I don't want to undermine Mr. Cott's argument, but my concern is that Mr. Kohring will be thrown into this pool of people like Bill Allen and Rick Smith and Pete Cott, who would sit around and get extremely intoxicated and talk extremely inappropriately. And the transcripts in my case of Mr. Kohring, who is a Christian sort of gentleman, he never swears, he never says anything, he never promises to do anything for whatever is provided to him. If you take the government's case, its best case scenario, we're talking about less than $5,000. What's more important is that Mr. Kohring never voted for PPT ever, which I think is also very important. So the issues, and if you listen to the tapes of Mr. Kohring with Mr. Smith and Mr. Allen, there were numerous occasions, I was the trial attorney, I'm one of the only people here involved in this that went through this whole process. In the tapes, there were numerous times where Mr. Kohring said, I want everything to be above board. I want to make sure that everything is above board. And he would say that a number of times during the course of these interceptions. I'd like to talk first about the closed courtroom. I did object very strenuously. This trial went very, very fast from my perspective. The trial judge was very interested apparently in efficiency or some other reason for moving things along very quickly. I was sitting in my hotel room in Anchorage and got a motion saying that there was going to be a closed hearing, and it was the government's request in Mr. Kohring's case, to discuss eliminating the testimony, and basically the guise of the government, these government prosecutors who were not here, was to prohibit selective prosecution arguments. And I had no idea what they were talking about. I showed up in open court in the morning and objected. I said I object to all closed hearings, particularly if there's no reason given that makes any sense to me. And I very strongly objected. And the judge, in his typical manner, basically just said, well, fine, we're going to have one anyway. We went next door. I objected in the hearing. And it turns out that the whole purpose of the hearing was to protect Mr. Allen. There was nothing discussed at that hearing regarding selective prosecution. Well, there was. I'm sorry, this is going to go on so long. I'm here. Well, the judge did discuss selective prosecution with you. He said that your opening statement, you made a remark that could be construed as selective prosecution. And then the government said yes. And then you said, no, I'm not making that argument. And the court said, fine. So it was discussed. Well, I think it was part of it. In your memory, you've read the transcript more recently than I have. As I said, things were moving quite fast. But what clearly the judge, in his order, indicated was the result of that hearing was my inability to cross-examine Mr. Allen and Mr. Smith on a number of areas. And then the other thing, you know, I'm a trial lawyer. I've done over 250 trials. Been doing this a long time. And I'm going, well, why can't we do this in open court without the jury? There was no compromise. The government is going to argue that it was to compromise investigations. There was nothing discussed in that hearing about compromising investigations. The only purpose for that closed hearing was to protect Mr. Allen from embarrassment about things that he may or may not have been involved in, which were pretty seedy and pretty bad. There would be no reason you couldn't have that hearing without the jury present. And then if you couple that with the other argument I'll get to is it turned out that the trial judge was neighbors 40 feet away from Mr. Allen, then the whole process seems to get a little bit questionable, to say the least. After this hearing, closed hearing, which I'm not even going to address the government's argument that it's not part of the trial because it's clearly part of the trial. I came back and once again made a record saying I objected to it. I objected to everything that happened there. The press came in and made some objections, and the judge made his order. But at no time did the judge fulfill the requirements of making a record as to why it was necessary, why there weren't other alternatives pursued. Because my understanding of this court's law is there's a presumption that all court hearings should be open, and it is structural error. And to get to the question that you asked about, and I think maybe I could rephrase it if you don't mind, if it's not structural error, what is the prejudice, basically? I think you said a question along those lines. It is structural error. And I think in this case there could be. If the public had known and the press had reported the things that were spoken about in that closed hearing about Mr. Allen and Mr. Smith, we might have had witnesses coming forward to us from the community saying, yeah, I know about Mr. Allen and Bambi. I know about Mr. Allen and his threat to kill a relative. You know, that could have happened clearly. But I'd like to just turn that around. There's no reason I can see of any kind to have had a closed hearing other than to protect Mr. Allen and Mr. Smith. There was none. Everything else could have been done in open court without the jury present. Did the government express at the hearing its reasons why it thought the hearing should be closed? No. And they said, he said after he was put on the spot by the press attorney and after I came back in and threw another fit in open court, he said it was necessary to protect ongoing investigations. But that was not the subject of the hearing. That was not at all the subject of the hearing. And as a matter of fact, the quote from the Waller Court, which is a little bit lengthy, but I think it's very dispositive in this case, the states proper was not specific as to whose privacy interests might be infringed. I'm reading from the Waller Court. How they would be infringed, what portions of the documents might infringe upon them, and what portion of the evidence consisted of the documents. As a result, the trial court's findings were broad in general and did not purport to justify closure of the entire hearing. The court did not consider alternatives to immediate closure of the hearing, directing the government, so on and so forth. And that was in Waller, basically, saying that the record was not clearly necessary, appropriate to support the closure. Well, of course, Waller was a much longer proceeding, right? A closed proceeding. Sure, but I think that if, as I understand, this court has been very strong on keeping courtrooms open for Sixth Amendment reasons, not just First Amendment reasons. I mean, I was a lawyer in Seattle Times versus Chicago, so I know the First Amendment parts, too. But I know this court's been very protective of a person's right to trial. On the other hand, you know, as an experienced trial lawyer, I mean, you must have been in a lot of situations where, you know, I mean, for instance, a lot of judges hold, you know, conferences to settle jury instructions in chambers. Isn't that true? Oh, yeah. No one ever considered that to be a Sixth Amendment violation. But the result of that was... No, the reason is it only involves, you know, the legal issues. Well, this did not only involve the legal issues. This involved solely protecting Mr. Allen and Mr. Smith from cross-examination. But the question was the government wanted to restrict your cross-examination. That was the legal issue. Now, you can characterize it fairly or unfairly as they were trying to protect him, but they were trying to restrict your cross-examination. So let's assume for the sake of argument this entire colloquy had happened in chambers. I would have not allowed it to happen in chambers. I mean, I do everything I can. These things happen in trials. Sorry? These things happen in trials. You say we're going to talk about this morning's proceedings. Counsel will come back in. What are you going to do today? The lawyers lay it out for the judge. That's not uncommon. You know, as I say, I've tried at least 200, probably 250 cases. Those kinds of things happen. But whether I participate in those things willingly or not is one thing. Sometimes when I do willingly, it would not be for such a substantial issue as limiting my cross-examination, which not only my client had a right to have done publicly, but the public had a right to hear about. I think you really need to look at it. Right, but the public's right and your client's right are two different rights. It's a first-amount right and a second-amount right. They're distinct rights. And I articulated the reason I think there was. Anchorage Daily News isn't here, so. I'm sorry. They have a different. They would have a different argument. Right. I think I addressed the Sixth Amendment issue, what could have happened in this hearing. Witnesses could have come forward and said, yeah, I know about all this. I mean, I think you, as I understand it, you really need the court, the reviewing court really needs to determine whether there were alternatives to closing the courtroom, whether the judge articulated the reasons why that wasn't necessary, not this sort of whisk everybody next door and we're going to have this hearing with no notice about supposed to be about selective prosecution and then go in and talk about limiting testimony of the critical government's witness who happened to be a next-door neighbor of the trial judge. Well, you know, the district court started off the hearing by saying, we're having this hearing because to see if we can afford it. Well, I'll quote the judge, the purpose for having this hearing on a sealed record is to see if you can afford you some latitude in your cross-examination of two witnesses who are participating in ongoing investigations. The integrity of those investigations may be threatened by the disclosure of information, and that's the reason for the hearing. That's what he said. And that was discussed. What was discussed was? Then the judge goes on to discuss. He asked the government what they want to limit, and he said, we don't want you to get into any, and the government describes two or three different areas they would prefer not to get into. Examination about Tyree, the Murkowski administration, the golf tournament, and so forth. And that had nothing to do with selective prosecution. No, but the selective prosecution was given as a second reason, and you cleared that up right away. So it was discussed, and you said, I'm not going to rely on that, and the court said, fine. Then it gets into the discussion of why the government wants to limit your examination because it would compromise an ongoing investigation. But there was never any discussion of compromising. The fact that Bill Allen was having a relationship with Bambi or Tyree or whatever her name was is not part of the investigation of the Alaska corruption trial. The government's argument was it was compromising. Your argument is it didn't compromise. I mean, that's a fair subject of an initial closed hearing, isn't it? If everything was done in good faith. Let me back up and ask a hypothetical question. Do you think that a district court is prohibited, if there's an ongoing investigation the government says is compromised, from closing a hearing as a preliminary matter to determine the truth of the allegations? You mean to determine whether it would compromise the ongoing investigation? No, I think that is appropriate. Okay. Well, so the district court here basically said, that's what I'm going to do. Now, you may say, no, it didn't end up that way. But why isn't that initial reason sufficient? Because that reason should have something to do with the result. In other words, I was a ruse. I believe that whole procedure of the closed hearing was a ruse. And the total by the government, which the court went along with, was simply to protect Bill Allen and Rick Smith from things being said publicly about them, which would undermine their credibility. Not only in Mr. Corian's trial, but in the subsequent trial of Senator Stevens and others. So I think it was a complete ruse. And I don't think any of this was done in good faith. But to answer your question directly, sure, that if there was a legitimate concern about protecting ongoing investigation of other legislators in Alaska who were the subject of an investigation, going into it, I think that would be appropriate. And I probably wouldn't have been so objectionable. So why isn't releasing a transcript of that hearing now the appropriate remedy? Well, because I think I answered that. I know you asked that question. I think I answered that question in that in Mr. Corian's case it would have been very helpful, I think, for the public to know what the allegations were about Mr. Smith and Mr. Allen. And witnesses could have come forward from that. And that happens. And frankly, I think that's one of the reasons why the government closed the hearing. So it would eliminate members of the public reading it in the newspaper and saying, hey, I know about this relationship with Bambi, or I know about his plot to kill one of his relatives. And if the government had given him immunity, and this gets into the whole matter of what happened in the Stevens trial, really, but if the government had given Mr. Allen some sort of immunity for an investigation of a homicide case, that would have been a gigolo issue, which we should have known about. So I don't know. Maybe I take closing a courtroom more seriously than you do. And believe me, there was a time in my life when I was on the other side of that issue. But I just have an immediate negative reaction. But to your hypothetical, I would say that's fine. Okay. You've got about five minutes left. Do you want to get to some of the other issues? Well, you know, the one that's most difficult for me and has been difficult all along is the judicial recusal issue. In this case, you have read, I'm sure, a great deal of information that we have presented about the antagonistic relationship between the trial judge's wife and my client nine years prior, which was on the front page of newspapers, where my client called or referred to Mrs. Sedgwick as a group of individuals who were spending like, quote, unquote, drunken sailors. And my client responded that these people that were, including Mrs. Sedgwick, were people who had cushy jobs and were going to lose their cushy jobs. When did you learn about this? I didn't learn about it until seven days after the verdict. And Mr. Coring, who – and I don't mean this. If he was here, I'd probably say it even in front of him. Mr. Coring is kind of like an Andy Griffith sort of character. He's very vague. You've never heard him swear. You've never heard him do anything like that. And he does say things like, golly, gee whiz. I mean, he actually does say things like that. And he called me and said, you know, I just figured out that this woman I saw during closing arguments in the trial was Deborah Sedgwick, who I think is married to Judge Sedgwick, and she was my nemesis when I was in the legislature for a number of years. And this animosity was on the front page of the newspaper. It's beyond – I don't understand how it could not have been the subject of conversation between the judge and his wife. When there was the animosity during the legislative sessions, but particularly after Mr. Coring gets charged, there had to have been discussions. I mean, it's just – and the standard is a very low standard for me. The appearance of fairness is a very, very low standard. Let me just use this as a hypothetical. I'm a trial lawyer. Before you get into that, why did – you learned about this seven days after the verdict, but you didn't file your recusal motion then. Why not? I would never do that against a federal judge until I investigated it and made sure that I was correct. And how long did that take? A number of months because Mr. Coring spent six weeks just going through his document files in order to get the documents that we needed because, frankly, I was very skeptical. I said I could not believe a federal judge who had this kind of relationship with his wife, who had a relationship with Mr. Coring, would not at least tell us about it. And then I also don't understand – He issued the ruling and he said, I don't remember it. And I think that's – If you take that at face value, what's the problem? Well, because I don't think you can take that at face value because the standard is so low, which is the appearance of impropriety. What would have been the harm of Jed Sedgwick saying, oh, by the way, I think everybody should know that Bill Allen is my next-door neighbor? What would have been the harm of that? In a small community, though, what does that have to do with anything? I mean, I'm serious. I mean, I come from a small community, and if I had to say everybody appeared in front of me, I couldn't sit on the cases, it would wipe out dockets in small communities. Well, I am told weekly by judges, Mr. Brown, you should know that I used to practice law with so-and-so. Mr. Brown, I've been told you should know I used to date so-and-so. Mr. Brown, you should know these things. The judges go out of their way to let us know when there's a potential conflict of interest, and they should and they're required to under the canons of judicial ethics and under the statutes that we've cited. And the timeless argument is there's nothing that was delayed as a result of my taking time to do this carefully. This is not an easy thing for someone to do. And to make sure that the facts were correct, make sure that the law was correct, and then file the motion. So I don't think there's a timeliness argument that this has any merit. Let me ask you this. If you're a trial judge and you ask jurors, does anybody know any of these witnesses, and the juror goes either next door to Mr. Allen, you're going to ask that juror more questions. Does anybody know the defendant, Mr. Coring? And the juror raises his hand. Mr. Coring tried to get rid of my wife's job. That person's going to be excluded. There's no question about it. That person is going to be excluded. And the bar here is very, very low. And then given some of the things that happened in the trial, then you begin to question why we weren't at least told these things by Judge Sedgwick. And am I out of time? You are out of time. I'll give you some time for about a minute. Okay. We'll hear from the government. Good morning, Your Honors. Please accept Kevin Gingras on behalf of the United States. For approximately 2002 to 2006, Victor Coring, while serving as an elected public official, received bribes from and took action to benefit the interests of the oil services company, VECO. The trial evidence, including approximately 26 recordings of conversations involving Coring and the VECO executives, as well as testimony from two of those former VECO executives, showed that Coring repeatedly promised to cast votes and take other official acts in VECO's favor. On a number of matters of interest to VECO, including the petroleum production tax proposal that was then pending before the Alaska State Legislature. In exchange, Coring received multiple cash payments and a VECO job for his nephew and even tried to solicit a $17,000 payment at one point. Now he's raised a handful of claims on appeal, some for the first time. And I'll limit my focus to those that my learned friend has now raised. I can start with the closed hearing if the Court would still like to talk about it. Could you give in your motion as the reasons for requesting the closed hearing? Your Honor, I believe that the government wanted to address the selective prosecution, what they perceived to be selective prosecution argument that was going to be coming. That was your reason? If I remember the record correctly, that was the reason, Your Honor. I think that it eventually, the progression of the hearing raised a number of other issues. But had the opposing counsel said we're not going to press that issue at all, shouldn't that have been the end of it and gone back into open court? I don't know that that's the case because I think some of the issues that came up involved, as the Court found repeatedly on the record, that the government still had an interest in protecting investigations against or involving a couple of these witnesses. But he was going beyond what you had requested, is that correct? Your Honor, I'm not 100% sure exactly if the only grounds that we raised, and I apologize for this, I can certainly follow up on your question, if the only grounds that we raised was the selective prosecution grounds, although that was certainly, I think, at the forefront of the government's mind, to be sure. Well, why would that require a closed hearing? I'm sorry, I couldn't hear. Why would that require a closed hearing, selective prosecution alone? I think it's one thing, as we heard in the companion case, where it's sought because there's an ongoing investigation, and the district court raised that to its body. But why would select, let's parse out the issues, why would an allegation of selective prosecution require a closed hearing? Well, I think it would depend on what the evidence, or excuse me, what the information at issue was going to be. And again, I'm not, as I stand here, I apologize again, I'm not 100% sure that that was the only reason that the government raised in its motion. Let's take them one at a time. Let's say the government stands up and says we want a closed hearing because I think the defense is going to present a defense of selective prosecution. Okay, so far, so good. The defense says we're not, as the defense said promptly in the closed hearing. The justification for the hearing has disappeared. True? On that basis? I think it might have, but I think it would depend on how the sort of hearing has evolved at that point or whether the issues of the other ongoing investigations has sort of propped up. All right, well, I'm taking it one at a time. And let me return my, why would an allegation of selective prosecution require a closed hearing in the first instance? I don't get it. I think it would depend, Your Honor, on what the nature of the information was going to be. If, I mean, perhaps sort of in retrospect, it would be something to do just out of the presence of the jury, but I think that the government and the court. Yes, you see, I don't think it's really, as I understand that part of the motion, the government really wasn't arguing that it should be closed to the public. It just didn't want this to get to the jury, right, because the government considers this essentially a nullification argument. That's the way I understand the motion. But the second part of that motion is, I'll just read without, you know, it's sealed, but without reading the motion, but point two is that the court should preclude cross-examination of Allen and Smith concerning the three non-public investigations discussed below. So I think that, in effect, turned out to be the main reason why you're still pressed for the closed hearing, right? That's right, and thank you, Judge Schema, for reminding me about that second portion. I think that is, that's exactly right. And, I mean, this idea of the investigations being a ruse to protect Bill Allen, I mean, this is the first time that I've heard this from the other side, and they don't raise this issue in their opening brief. Their claim is limited strictly to the district court's procedural, the way the district court proceeded and the measures that it took. And I think the record is clear that the district court fully articulated its findings and reasons for its decision to briefly close the hearing. And that's, I mean, again, that's assuming the Sixth Amendment is even implicated. And we've been talking now for a while about whether the Sixth Amendment is, in fact, implicated. If the court still has questions, I'm willing to answer that. I think Waller is, I mean, this case is entirely unlike Waller. Well, it is in terms of the length. But, in fact, this happened during the trial. It was a hearing of discretion. I don't think there's a serious argument can be made that it's not part of the trial, frankly. No, I think that's right, Your Honor. But I think if you look at the rationale in Waller, I mean, it's not just the fact that it's taking place in trial. I mean, it's sort of, they talk about the nature of the suppression hearing and the sort of trial-like nature of the suppression hearing and how there's witnesses testifying and how the outcome frequently depends on the resolution of factual matters at the suppression hearing or that you have the accused who routinely attacks conduct of police and prosecutors and that those types of hearings should be open to public scrutiny. So there's a lot of, I think Waller is very instructive on sort of how you look at what falls under the Sixth Amendment and if there are reasons that the Sixth Amendment would protect something like a suppression hearing. So I think it just goes beyond the fact, it goes beyond just the fact. We have open public trials and when a defendant says, I want this to occur in public, that's then other, the rights are triggered. And then there has to be some compelling reason given to close the hearing. And not only that, of course, in this case what we have is the press intervening as well. There weren't findings of alternate. There was notice to the press. There was not, although I know they're not here today, but notice wasn't given to the press. Notice wasn't given to the public. Reasonable, lesser alternative reasons weren't considered or measures weren't considered. None of that happened here. Well, I think the alternatives, I think it's fair to say the import of the district court's comments on why it closed the hearing, I mean, how else could you protect these investigations without keeping it from the public? I mean, I think that the. . . No, that's just fine. I'm just saying we need findings, we need specification, especially once the defendant or anybody else has raised an objection. Now, you know, one of the alternatives in the First Amendment sense is to release the transcript. That's one alternative. I assume the government doesn't have any objection to that at this point, right? I think I would want to be sure about what is still on the transcripts and what investigations are still pending before I would agree to something like that. But I think, if that aside, I don't. . . I think that would be an adequate remedy given the situation. If you compare it to. . . That wasn't considered or accepted or rejected at the time. I think that's right. And, I mean, you could compare it to, and I don't mean to be. . . I don't mean to inject some hyperbole, but in a sort of classified information sort of setting, you have things. . . I mean, you have sort of similar ideas in play where you release transcripts afterwards that are redacted to protect any material that still needs to be protected, and I think that's perfectly fine, I think, given the context of the case now. The other issue, if I could just quickly address, is the recusal motion. And, again, my learned friend keeps saying that it's a low standard. I mean, it's a low standard only in the most general sense that you're talking about the appearance of impartiality. But what's actually been articulated by this Court and a number of other courts is that it's not just the appearance to anybody who is not familiar with what the facts are. It's whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. And that reasonable person is a well-informed, thoughtful observer who is not hypersensitive or unduly suspicious and someone who understands all of the relevant facts and the law, which this Court said in Holland. So it's a fairly well-informed, I mean, to quote the language back, it's a well-informed, thoughtful observer who knows all the facts and the law. And on this record, I think no fully informed person could conclude that the judge appeared impartial. The judge's order is very careful. He walks through all the actual facts and sorts out what are the facts of what actually happened and what are the sort of conclusions and, you know, accusations and surmise injected by the defendant about animosity and this and that. And that order walks through and listens to the tapes, describes the tapes, and, you know, these are civil conversations. These are these. Cut to the chase. What he really says is, I forgot about it. I think that's in addition, Your Honor. He also clearly notes, look, I've never, you know, I don't have any recollection of my wife telling me about Coring or that I've ever heard about Coring's allegations from other sources or, you know, that he had any involvement with respect to this legislation that merged these two departments that led to my wife's new job. When you go through the tapes and what was said, there was an unusual animosity. I think he's just human nature tells me that he was wrong there. So how much credence do we give to his saying? In any way, I didn't remember. I apologize, Your Honor. The first part of your question, are you referring to the judge? Yes. He goes through all this. But if you read the transcript yourself, you can see tremendous hostility and not just ordinary differences of opinion. But then he says, well, it was not that. It was civil conversation. And I don't think the reasonable person would think that. So then you come down to his saying, but in any event, I didn't remember. Well, and to me, you know, with respect, Your Honor, I think I would disagree with your assessment of Judge Sedgwick's characterization of those transcripts. But I think it's, you know, I don't think you put an enormous weight on the judge's recollection about his wife and Coring in the sense that it's certainly not dispositive. I think it's worth putting on the record. I think it was wise for him to put on the record whether he, in fact, had any recollection or not. But I think the standard is still sort of an objective standard and that you take the facts as they are put out, including the recordings, including the transcripts, including the articles where, again, she's not named personally and they're sort of directed generally, and you say, is the district court abusing its discretion when it makes this determination of what a reasonable person would find? And I think, of course, there you can, as the defense clearly points out, these things are subject to different interpretations, but did the district court abuse its discretion in saying that a reasonable person would not reach those interpretations, given all these facts? And I don't think, based on this record, that that's a conclusion, certainly not one worthy of reversal in this case. The objective, most judges ask someone else to conduct the hearing. I think that's right. And I think the judge tried to at the beginning, added an abundance of caution before the, I apologize, I forgot the other judge. Judge Holland. Judge Holland pointed out that under 455, he needed to make that determination. So I think that the judge, again, speaks to his trying to be completely fair and to borrow a phrase from the other side above board and try to refer it to another judge in that first instance. If there are no other questions, I would just yield the rest of my time to the court, unless I can discuss the Brady issue, but you want to talk about that perhaps after. We'll talk about that later. Okay. Thank you. Thank you, counsel. We'll give you two minutes. Your Honor, I did not want to neglect, or Your Honors, I did not want to neglect the bumper issue, which I think is a very strong issue in this case. But I think the briefs cover that really well. And if you raise it now, I'll have to give them more time. So I would suggest you don't. Okay. And also the habit evidence, which I think is really, really important in Vic's case. When Vic calls me from Taft Prison, he always says, anything I can do for you. This is his mantra. This is what he says to everybody. And there was not, you know, the smoking guns in Vic's tapes were not like they were in other tapes at all. And so eliminating that habit evidence really did undermine us. Now, I am concerned about the government's behavior today about trying to say that this closed hearing was for selective prosecution. They had a closed hearing also in Cott. Okay. And it wasn't that Mr. Cott's attorney hadn't been accused of doing selective prosecution. Both hearings, as Judge Lasheeda has pointed out in this, they did raise, and you're hearing they raised selective prosecution and the ongoing investigations. In Mr. Cott's case, they raised the ongoing investigation question. So there were closed hearings in both cases. Yes. That's what I'm trying to say. It wasn't just the motive was for selective prosecutions. And then one of the concerns I have about Judge Sedgwick judging his own impartiality, I mean, I would certainly have trouble judging my own impartiality. No, but that's what the rules call for. Pardon? You know, he did try to refer it to another judge, but the rules say on these kind of questions, you have to, the judge has to address it in the first instance. Correct, but then it's your responsibility to review those to determine whether that's an adequate factual basis for it. Because I am confused a little bit by Judge Sedgwick in his opinion saying he did not know about the situation and then later on himself saying he did not discuss the situation. Now, as a trial lawyer, I wanted to have a hearing on this issue. I mean, I know it. I have been in a situation where a judge did take the stand, and I did. It was very uncomfortable for me, but I did have to ask the judge questions. But, I mean, there was no record here other than what Judge Sedgwick made part of the record, and I think I'm out of time. Okay. Thank you, Counsel. The case should be submitted. We do have in both cases a motion that has been made for Brady disclosure. The government has not had an opportunity. You may sit down, Mr. Brown. The government hasn't had the opportunity to brief that as yet. Do you want the opportunity to brief it, or do you have a response today? Yes. We have, Your Honor, received the Brady motions, and we would like an opportunity to respond and to brief them, and we fully intend to do so in due course if the Court will let us. All right. You have 14 days to respond to the motion. And I would just like to add, even before we received these briefs, in light of recent well-publicized events in the Senator Stevens case, the Department had already begun undertaking a review of discovery of these cases. All right. So you can communicate that today after this hearing to the Counsel here, and you can discuss the Brady issue. I'm giving the government the chance to brief it, so it's inappropriate, really, to have oral argument on it today. We'll give the government 14 days to file its response. In the meantime, since you're all here, why don't you consult on those issues and see if you can come to some agreement. The government may or may not be able to respond fully today, but I'd ask all of you to get together after oral argument. Thank you, Your Honor. All right. The case is just ready to be submitted. We are in recess for the morning.
judges: Fletcher B. , Tashima, Thomas